924 F.2d 568
 32 Fed. R. Evid. Serv. 439
 Ray James MUNN, Individually, and Ray James Munn,
Administrator of the Estate of Elaine Munn, Deceased, on
Behalf of the Heirs at Law and Wrongful Death Beneficiaries
of Elaine Munn, Deceased, Plaintiffs-Appellants,
v.
Trudy E. ALGEE, Defendant-Appellee.
 No. 90-1173.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 28, 1991.
 
 Phil Zerilla, Jr., Martin & Zerilla, Memphis, Tenn., for plaintiffs-appellants.
 Gary K. Smith, Robert H. Harper, Shuttleworth, Smith & Webb, Memphis, Tenn., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Mississippi.
 Before RUBIN, SMITH, and BARKSDALE, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 Plaintiff Ray James Munn asserts that his and his deceased wife's adherence to the Jehovah's Witnesses faith was used improperly to impair his ability to recover compensation for their injuries. Finding no reversible error, we affirm.
 
 
 2
 I. Facts.
 
 
 3
 On Christmas morning 1986, vehicles driven by Munn and defendant Trudy Algee collided in Tunica County, Mississippi. Elaine Munn, Munn's wife and a passenger in his car, was transported to the Regional Medical Center in Memphis, Tennessee, arriving approximately three hours after the accident. Doctors identified a variety of injuries, including multiple rib and pelvic fractures, a lacerated chest artery, and a retroperitoneal hematoma.
 
 
 4
 Upon arrival at the hospital, Mrs. Munn informed doctors that she was a Jehovah's Witness and thus would not accept blood transfusions. Responding to her deteriorating condition, doctors unsuccessfully sought Munn's permission later in the day to perform a blood transfusion on his wife. Munn also refused to allow doctors to transfuse Mrs. Munn's own blood back into her.
 
 
 5
 Mrs. Munn died on the operating table from a loss of blood. Elaine and Ray James Munn incurred medical expenses in the amounts of $10,411.67 and $241.44, respectively.
 
 
 6
 II. Procedural History.
 
 
 7
 Munn brought suit against Algee in three separate capacities: (1) individually for his own injuries; (2) as administrator of his deceased spouse's estate; and (3) on behalf of his children, who, along with Mr. Munn, are the wrongful death beneficiaries under the Mississippi wrongful death statute, Miss.Code Ann. Sec. 11-7-13 (Supp.1990). The district court granted Algee's motion for partial summary judgment, thereby precluding Munn from establishing what his wife's damages would have been had she consented to the blood transfusions and survived. The court granted a directed verdict in favor of plaintiffs on the question of liability.
 
 
 8
 After a trial, the jury awarded Munn $241.44 for his own medical expenses. It also returned a verdict for Munn in the amount of $20,411.67 to compensate Mrs. Munn's estate for her medical bills ($10,411.67) and her pain and suffering ($10,000.00). With respect to the wrongful death claim, the jury concluded that Mrs. Munn would not have died had she accepted blood transfusions and thus awarded the wrongful death beneficiaries no damages.
 
 
 9
 Munn moved for a new trial, asserting that the court erred in (1) admitting evidence of Jehovah's Witnesses' beliefs; (2) allowing Algee to invoke the avoidable consequences doctrine; (3) refusing to allow Munn to show what his wife's damages would have been had she accepted blood and lived; (4) refusing to apply the eggshell skull doctrine; (5) entering judgment on allegedly inconsistent answers to jury interrogatories; and (6) its instructions to the jury. Munn also argued that the verdict was against the great weight of the evidence and that the damage award was inadequate. The court denied the motion for new trial, 730 F.Supp. 21, and Munn now appeals.[1]
 
 
 10
 III. Admission of Evidence of Religious Beliefs.
 
 
 11
 Over Munn's objection, the district court allowed Algee's counsel to question him about many aspects of the Jehovah's Witnesses faith, including, inter alia, the following beliefs and practices: (1) Christ's physical return to earth in 1914; (2) the eternal damnation of all those not adhering to the faith; (3) the non-existence of hell; (4) the non-existence of souls; (5) refusal to "do service to their country"; and (6) refusal to salute the flag. Algee's counsel further questioned Munn about his and his wife's adherence vel non to the faith's prohibition on premarital cohabitation.
 
 
 12
 The admission of this evidence raises two questions: (1) whether the district court abused its discretion in admitting Munn's testimony, see Jon-T Chems., Inc. v. Freeport Chem. Co., 704 F.2d 1412, 1417 (5th Cir.1983); and (2) assuming the court abused its discretion, whether this error affected any substantial right of Munn's, see Fed.R.Evid. 103(a); LeBoeuf v. K-Mart Corp., 888 F.2d 330, 333 (5th Cir.1989).[2]A. Admissibility.
 
 
 13
 Evidence is relevant (and thus potentially admissible) if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. For Munn's testimony to be relevant, it is essential to identify a "fact of consequence" whose existence is made more or less probable thereby. Because we are unable to discern a fact of consequence of which this testimony is probative, we hold that the court erred in allowing the questions and that the error constitutes an abuse of discretion.
 
 
 14
 Algee asserts that the fact of consequence of which this testimony is probative is the sincerity of the Munns' adherence to their faith.[3] One might plausibly argue that sincerity is a fact of consequence in that a decision sincerely motivated by a religious belief is more reasonable[4] than an otherwise inexplicable action. However, only the discussion of the Munns' adherence to the prohibition on premarital cohabitation reflects upon their sincerity. Simply inquiring otherwise into whether the Jehovah's Witnesses faith incorporates certain beliefs does not reveal anything about whether the Munns sincerely adhered to them.
 
 
 15
 Nor were these questions directly probative of the reasonableness of Mrs. Munn's decision to refuse blood. Algee fails to demonstrate how Jehovah's Witnesses' beliefs unrelated to blood transfusions reveal the reasonableness of her adherence to one particular article of the faith.[5]
 
 
 16
 Algee further asserts that, in any event, she was entitled to counter Munn's direct testimony about his wife's religious beliefs. However, Fed.R.Evid. 611(b) limits the scope of cross-examination to "the subject matter of the direct examination and matters affecting the credibility of the witness."
 
 
 17
 The bulk of Munn's testimony on cross-examination did not concern the sincerity of his and his wife's beliefs. As noted above, simply listing Jehovah's Witnesses' beliefs says nothing about the sincerity of the Munns' adherence thereto. Accordingly, this testimony was not within "the subject matter of the direct examination." Moreover, Munn's direct testimony did not cover any beliefs other than the prohibition on blood transfusions. Accordingly, because Munn's testimony did not tend to prove or disprove any (permissible) material fact and thus was irrelevant, its admission was error amounting to an abuse of discretion.[6]B. Reversible or Harmless Error.
 
 
 18
 However, simply because the court abused its discretion in admitting his testimony does not entitle Munn to relief. Rule 103(a) indicates that courts of appeals should not reverse on the basis of erroneous evidentiary rulings unless a party's "substantial right" is affected.
 
 
 19
 This question is not susceptible to mechanical analysis. "Rule 103 is silent as to what factors a court must consider in determining whether substantial rights have been affected, indicating that the court must proceed on a case to case basis rather than apply a mechanical rule." 1 J. Weinstein & M. Berger, Weinstein's Evidence p 103 at 103-6 (1990). However, we have stated repeatedly that " '[a]n error is harmless if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict.' " Pregeant v. Pan Am. World Airways, Inc., 762 F.2d 1245, 1249 (5th Cir.1985) (quoting United States v. Underwood, 588 F.2d 1073, 1076 (5th Cir.1979)).
 
 
 20
 After reviewing the record, we conclude--although it is a close question--that the admission of Munn's testimony did not adversely influence the jury. Munn failed to articulate any substantial right affected by this evidence's admission,[7] and no prejudice is reflected in the jury's verdict.
 
 
 21
 First, Munn cannot plausibly argue that the amount of damages for pain and suffering awarded to Elaine Munn's estate demonstrates prejudice. For approximately eight hours of pain and suffering, the jury awarded $10,000.00, an amount not so small as to arouse suspicion as to the jury's motives.
 
 
 22
 Second, the jury's failure to award Munn any damages for his own pain and suffering most likely reflects the relatively minor nature of his injuries. See Pregeant, 762 F.2d at 1249 (fact that verdict was otherwise supported demonstrates harmless nature of erroneous admission of evidence). He incurred only $241.44 in medical expenses and by his own admission suffered only "bruises and contusions."
 
 
 23
 The jury's failure to award any wrongful death damages is the most plausible expression of any prejudice caused by the erroneous admission of this evidence. However, the jury most likely refused to compensate the wrongful death beneficiaries because it believed that Mrs. Munn would have lived had she taken blood transfusions. A number of doctors testified as to whether blood transfusions would have saved Mrs. Munn's life,[8] and although their testimony was conflicting, the evidence was such that in deciding the cause of Mrs. Munn's death, there is no indication that the jury was using her refusal to take blood as a pretext for expressing its possible distaste for Jehovah's Witnesses. See id.
 
 
 24
 Thus we hold that the erroneous admission of Munn's testimony did not affect any substantial right. In this regard we affirm the denial of the motion for new trial.
 
 
 25
 IV. The First Amendment and the Avoidable Consequences Doctrine.
 
 
 26
 In an effort to avoid liability for Mrs. Munn's death, Algee argued that Mrs. Munn's refusal to accept blood transfusions was unreasonable and thus that the doctrine of avoidable consequences[9] precluded any recovery. Munn now asserts that application of this doctrine violated the first amendment's free exercise and establishment clauses, arguing that the rule burdened his wife's exercise of the Jehovah's Witnesses faith and invited the jury to consider the reasonableness of that religion.
 
 
 27
 Munn cites a published article to support his argument that application of this doctrine violates the first amendment. See Comment, Medical Care, Freedom of Religion, and Mitigation of Damages, 87 Yale L.J. 1466 (1978). The comment writer accurately identifies two judicial approaches to religiously motivated refusals to mitigate tort damages. Id. at 1467. The first, labelled the "objective" approach, holds that religion may not justify an otherwise unreasonable failure to mitigate. The second, termed the "case-by-case" approach, attempts to accommodate religious beliefs by allowing the jury to consider the plaintiff's religious beliefs in determining whether his or her failure to mitigate was reasonable.
 
 
 28
 The author concludes that the objective approach violates the free exercise clause, while the case-by-case approach violates the establishment clause. In the instant case, the court applied the case-by-case approach, attempting to accommodate Mrs. Munn's religious beliefs.[10]
 
 
 29
 Without identifying the court's approach, Munn argues that its application of the avoidable consequences doctrine violated both first amendment clauses. He accordingly desires, as did the comment author, see id. at 1468, 1486-87, that we recognize a special exemption from the doctrine's application for religiously motivated failures to mitigate damages. We decline to do so, as we conclude that proper application of the avoidable consequences doctrine does not violate the first amendment.
 
 
 30
 A. Free Exercise Concerns.
 
 
 31
 Munn contends that applying the mitigation of damages principle to this case violates the first amendment because it incidentally affects Mrs. Munn's exercise of her religion. This argument is foreclosed by Supreme Court cases holding that generally applicable rules imposing incidental burdens on particular religions do not violate the free exercise clause. See McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (Sunday closing laws do not violate free exercise rights of Saturday sabbatarians); Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (same); see also Employment Div., Dept. of Human Resources v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (free exercise clause does not prohibit application of Oregon drug laws to ceremonial ingestion of peyote). Accordingly, we hold that the application of the mitigation of damages doctrine, under either of the two approaches, does not violate the free exercise clause of the first amendment. Accord Corlett v. Caserta, 204 Ill.App.3d 403, 149 Ill.Dec. 793, 562 N.E.2d 257 (1st Dist.1990) (involving Jehovah's Witness).
 
 
 32
 B. Establishment Clause Issues.
 
 
 33
 The more compelling problem with the application of the doctrine in this case is that it potentially invited the jury to judge the reasonableness of the Jehovah's Witnesses' religion. See Hernandez v. Commissioner, 490 U.S. 680, 109 S.Ct. 2136, 2146, 104 L.Ed.2d 766 (1989); United States v. Ballard, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). We conclude that in an appropriate case, application of the case-by-case approach to religiously motivated refusals to mitigate damages can involve weighing the reasonableness of religious beliefs and thus arguably would violate the establishment clause. However, because here the court's application of this approach was designed to assist Munn in circumventing the avoidable consequences doctrine, we need not address squarely the constitutionality of the case-by-case approach, for in any event Munn is entitled to no relief.
 
 
 34
 Application of the case-by-case approach allows a jury to consider the religious nature of a plaintiff's refusal to avoid the consequences of a defendant's negligence. Accordingly, otherwise unreasonable conduct may be deemed reasonable. However, the question of whether a jury decides to label such conduct as reasonable may depend upon its view of the religious tenet that motivated the plaintiff's failure to mitigate damages. See Comment, supra, at 1484.
 
 
 35
 If the jury finds the religion plausible, it will more likely deem the conduct reasonable; on the other hand, if the particular faith strikes the jury as strange or bizarre, the jury will probably conclude that the plaintiff's failure to mitigate was unreasonable. Because the plaintiff's religion is the only basis upon which otherwise unreasonable conduct can be deemed reasonable, the jury undoubtedly assesses the plaintiff's religion in reaching its conclusion. A strong case can be made that the first amendment forbids such an assessment.
 
 
 36
 However, simply because the case-by-case approach might involve impermissible assessment of a religion's reasonableness does not mean that Munn is entitled to a new trial. Munn himself interjected religion into the case, seeking to explain his wife's conduct. Had he been prohibited from doing so, the jury undoubtedly would have deemed her decision unreasonable.[11] In short, the jury's assessment of Elaine Munn's religion did not harm Munn's case. Consequently, we find the court's application of the case-by-case approach to be, at most, harmless error.[12]
 
 
 37
 V. Proof Of Damages.
 
 
 38
 In granting Algee's motion for partial summary judgment, the district court precluded Munn from establishing what Mrs. Munn's damages would have been had she accepted the blood transfusions and lived. Munn v. Southern Health Plan, Inc,. 719 F.Supp. 525, 531 (N.D.Miss.1989). Munn unsuccessfully challenged this decision in his motion for a new trial and now appeals that denial.
 
 
 39
 When reviewing the disposition of a new trial motion, we normally reverse the judgment only for an abuse of discretion. However, when the district court's ruling is predicated on its view of a question of law, it is subject to de novo review. Dixon v. International Harvester Co., 754 F.2d 573, 586 (5th Cir.1985) (citations omitted). In Dixon, we stated that the disposition of a new trial motion "will not be disturbed unless there is an abuse of ... discretion or misapprehension of the law." Id. (emphasis added). See also Evers v. Equifax, Inc., 650 F.2d 793, 796 (5th Cir. Unit B 1981); Cruthirds v. RCI, Inc., 624 F.2d 632, 635 (5th Cir.1980). Because the availability of damages is a question of law, we do not afford the district court's decision any deference.
 
 
 40
 We nonetheless agree with the court's determination that Munn should not be compensated for these hypothetical damages, as Mrs. Munn did not actually suffer the harm from which the damages are sought. Mississippi law compels this conclusion. In Entex, Inc. v. Rasberry, 355 So.2d 1102 (Miss.1978), the court stated that "[t]he general rule is that where it is established that future consequences from an injury to a person will ensue, recovery therefor may be had, but such future consequences must be established in terms of reasonable probabilities." Id. at 1104 (citing 25 C.J.S. Damages Sec. 31 (1966)). It is not "reasonably probable" that the described injuries to Mrs. Munn will occur; in fact, because she did not survive the accident, it is certain that they will not occur. We thus affirm the denial of Munn's new trial motion insofar as it related to proof of damages.[13]
 
 
 41
 VI. Additional Issues.
 
 
 42
 A. Application of the Eggshell Skull Doctrine.
 
 
 43
 Munn argues that the "eggshell skull" doctrine, which requires a defendant to compensate a plaintiff for unforeseeable injury flowing from some pre-existing condition, entitles him to compensation for his wife's wrongful death. Munn attempts to extend the doctrine's application to situations in which the plaintiff's pre-existing condition is "mental" rather than physical.
 
 
 44
 However, the principle has been applied only to pre-existing physical injuries. See, e.g., W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on Torts Sec. 43 at 291 (1984) (referring to victim's "concealed physical condition") (emphasis added); Restatement (Second) of Torts Sec. 461 (1977) (same). We decline the invitation to extend its scope, absent substantial indication that the state courts of Mississippi would do so. Accordingly, the court did not err in refusing to apply the eggshell skull doctrine to the instant case, and its denial of Munn's new trial motion in this respect is affirmed.[14]
 
 
 45
 B. Inconsistent Interrogatory Answers.
 
 
 46
 The following interrogatory was submitted to the jury:
 
 
 47
 4. Do you find that the original injuries sustained by Elaine Munn combined with her unreasonable refusal of blood to cause her death?
 
 Answer: ______
 
 48
 Enter "Yes" or "No"
 
 
 49
 If your answer to this interrogatory is "Yes," what percentage did Elaine Munn's unreasonable refusal of blood contribute to her death? ____ percent (%)
 
 
 50
 The jury answered "yes" to the first part and "100%" to the second. Munn contends that these answers are inconsistent and consequently that the court erred in denying his motion for a new trial. More specifically, Munn argues that because his wife's original injuries "combined" with her refusal of blood to cause her death (according to the jury's answer to the first part of the question), her refusal to take blood could not possibly constitute 100% of the cause of her death.
 
 
 51
 When a litigant claims that the jury's answers to interrogatories are inconsistent, the seventh amendment compels the district court to seek a "view of the case which makes the jury's answers consistent." Griffin v. Matherne, 471 F.2d 911, 915 (5th Cir.1973).[15] The court properly applied this test, holding that the jury's answers were consistent with one another and with the applicable instruction.[16] Munn v. Algee, 730 F.Supp. at 27-28.
 
 
 52
 We agree with the court's conclusion. These answers do not conflict; instead, they reflect the entirely plausible view that although both the injury and the refusal were causal factors in Mrs. Munn's death, she would have survived had she taken the blood.[17] We accordingly affirm the court's denial of Munn's motion for a new trial insofar as that motion rested on this foundation.
 
 
 53
 C. Great Weight of the Evidence.
 
 
 54
 Munn amorphously asserts that the jury's verdict is against the great weight of the evidence, but he fails to specify which aspect of the verdict he finds objectionable. However, Munn seems most upset with the jury's apparent conclusion that Mrs. Munn would not have died had she accepted the blood transfusion.
 
 
 55
 We reverse the disposition of a new trial motion predicated on the movant's view of the weight of the evidence only if the court abused its discretion. Smith v. Transworld Drilling Co., 773 F.2d 610, 613 (5th Cir.1985) (citing Shows v. Jamison Bedding, Inc., 671 F.2d 927, 930-31 (5th Cir.1982)). Our deference is somewhat greater when the court denies the new trial motion. Jones v. Wal-Mart Stores, Inc., 870 F.2d 982, 986 (5th Cir.1989) (citing Franks v. Associated Air Center, Inc., 663 F.2d 583, 586 (5th Cir.1981)); Evers v. Equifax, Inc., 650 F.2d 793, 796-97 (5th Cir. Unit B July 1981).
 
 
 56
 Although various witnesses disagreed about whether Mrs. Munn would have lived had she consented to the blood transfusions, the jury was entitled to believe those witnesses who concluded that she would have survived. The jury was entitled to believe the testimony of Drs. Walker and Fabian, despite conflicting testimony, see supra note 8, and to conclude that she would have survived had she assented to the blood transfusions. Accordingly, the jury's conclusion in this regard was not against the great weight of the evidence, and the district court's denial of the motion for new trial is in this regard affirmed.D. Adequacy of the Damage Award.
 
 
 57
 Munn contends that he deserves a new trial because the jury award was inadequate. We do not alter a damage award unless it is so " 'inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial.' " Taylor v. Green, 868 F.2d 162, 164 (5th Cir.) (quoting Garrick v. City & County of Denver, 652 F.2d 969, 972 (10th Cir.1981) (citation omitted)), cert. denied, --- U.S. ----, 110 S.Ct. 127, 107 L.Ed.2d 87 (1989). Munn fails to specify which aspect of the jury's award was inadequate.
 
 
 58
 Although the court did admit potentially prejudicial testimony into evidence, see supra, the jury's award is not so inadequate as to shock the judicial conscience. That the jury was not improperly biased against the Munns is evident in its award of $10,000.00 for Mrs. Munn's eight hours of pain and suffering. Furthermore, its decision to deny the wrongful death beneficiaries any compensation reflects a reasoned application of the avoidable consequences doctrine. In addition, the jury's refusal to award Munn any pain and suffering damages mirrors the relatively minor nature of his injuries.
 
 
 59
 It cannot be plausibly argued that the jury's award is so inadequate as to shock the conscience. Consequently, we affirm the court's denial of this aspect of his new trial motion.
 
 
 60
 E. Jury Instructions.
 
 
 61
 Munn asserts that the court erroneously instructed the jury in two ways: (1) by directing the jury to judge the reasonableness of Mrs. Munn's decision to refuse blood against an objective standard; and (2) by refusing to inform the jury of the identity of the potential wrongful death beneficiaries. The court's instructions were appropriate in both regards, and we therefore affirm.
 
 
 62
 During the jury instruction conference, Munn's counsel urged the court to direct the jury to ask what a reasonable Jehovah's Witness would have done in Mrs. Munn's situation. The court refused to adopt this instruction, instead instructing the jury in a way that defies easy categorization as "objective" or "subjective":
 
 
 63
 In determining whether or not Elaine Munn's decision to refuse the blood transfusion was unreasonable, you may consider that the blood transfusions were medically recommended. But, you may also consider her religious beliefs and related teachings, together with the known risks of blood transfusions, if you find that to be a factor in her decision.
 
 
 64
 Both parties blithely conclude that this language reflects an "objective" standard of reasonableness. However, this standard is not purely objective; it does not ask the jury whether reasonable people would have done what Mrs. Munn did. It contains a subjective component, allowing the jury to "consider her religious beliefs and related teachings."
 
 
 65
 In any event, the proper characterization of this instruction is not the issue at hand; instead, the question is whether the instruction was wrong as a matter of Mississippi law. This instruction does not incorrectly state Mississippi law. More precisely, Mississippi cases considering the avoidable consequences doctrine do not prohibit this instruction. See Buras v. Shell Oil Co., 666 F.Supp. 919, 924 (S.D.Miss.1987) (applying Mississippi law); National Dairy Prods. Corp. v. Jumper, 241 Miss. 339, 130 So.2d 922, 923 (1961); Levy v. J.A. Olson Co., 237 Miss. 452, 115 So.2d 296, 298 (1959); North Am. Accident Ins. Co. v. Henderson, 180 Miss. 395, 177 So. 528 (1937).
 
 
 66
 None of these cases clearly indicates whether an objective or subjective standard of reasonableness should be applied; however, once again, that is not really the issue here, because the court's instruction in this case does not plainly reflect either of those paradigms. The above-cited cases either combine objective and subjective elements (as does the instruction in this case) or fail to specify which standard is to be applied.
 
 
 67
 For example, in Buras the court declared that a plaintiff "is required to take reasonable steps to mitigate his damages." 666 F.Supp. at 924. This "answer" to the objective vs. subjective debate begs the question. Most other cases similarly fail to address the question. See, e.g., National Dairy, 130 So.2d at 923 ("[o]ne seeking to hold another liable for damages must use reasonable efforts to avoid or mitigate them"); Levy, 115 So.2d at 298 (plaintiff required to "put[ ] forth a reasonable effort" to mitigate damages).
 
 
 68
 Some cases do apply a standard of reasonableness that is "subjective" in the sense that the nature of the plaintiff is taken into account. In Henderson, the plaintiff sought damages for his continuing physical disability, even though surgery would have enabled him to return to work and thus mitigate his damages. The plaintiff argued that he was unable to pay for the operation, and the defendant responded by asserting that the plaintiff's financial condition was not relevant to the reasonableness of his failure to mitigate damages.
 
 
 69
 The Mississippi Supreme Court rejected this position, stating that the mitigation of damages rule is "one of reason, and, if the injured person be powerless to take the needed step, reasonableness has become exhausted and the applicability of the rule is at an end."[18] 177 So. at 530. Although Henderson effectively jettisons the notion that Mississippi has a purely objective standard of reasonableness,[19] it does not render erroneous the district court's instruction, which did not contain a purely objective standard. The instruction allowed the jury to consider factors unique to the decedent, such as "her religious beliefs and related teachings." Hence, because the instruction comported with Mississippi law, the district court's judgment in this regard is affirmed.[20]
 
 
 70
 Munn also contends that the court should have informed the jury that the Munn children would be the primary beneficiaries of any wrongful death damages it awarded. Munn argues that the jury assumed that he would be the sole recipient of these damages and thus that the interests of the children were unfairly prejudiced.
 
 
 71
 This argument is utterly without legal foundation. The Mississippi wrongful death statute, Miss.Code Ann. Sec. 11-7-13 (Supp.1990), does not require that the jury know the identity of the beneficiaries. Munn fails to suggest any legal basis for this argument, and it accordingly must fail.
 
 
 72
 The judgment of the district court is in all respects AFFIRMED.
 
 
 73
 BARKSDALE, Circuit Judge, specially concurring:
 
 
 74
 I concur in affirming the judgment and all of the opinion except Part III.A. (Admissibility), which holds that the district court abused its discretion in permitting Mr. Munn to be cross-examined about certain aspects of the Jehovah's Witness faith. I do not find that it did; the evidence was relevant to the doctrine of avoidable consequences--the key issue at trial. Moreover, for certain of the questions in issue, it does not appear that Munn made the requisite Fed.R.Evid. 103(a)(1) objection. Nor did the scope of cross-examination violate Fed.R.Evid. 611(b); among other things, it was responsive to Mr. Munn's direct testimony.
 
 ALVIN B. RUBIN, Circuit Judge, dissenting:
 
 75
 The personal-injury and wrongful-death claims of two black Jehovah's Witnesses from Tennessee were being tried before a predominantly white jury in Clarksdale, Mississippi. Judge Smith correctly finds that the trial court erred in admitting irrelevant evidence that was calculated to evoke the jury's prejudices, but concludes that this inflammatory effort by counsel and error by the trial court did not affect a substantial right of the plaintiffs. In my opinion, this commits a legal error both because it equates effect on a substantial right with the likelihood that a different verdict would have been reached had the evidence been excluded and by substituting a judge's personal view of the effect of the evidence for the evaluation of its possible impact in this case before this jury: it minimizes the potential consequences of the deliberate appeal to religious prejudice and to chauvinism permitted by the trial court. Judge Barksdale's concurrence ignores the calculated inflammatory effect of the cross-examination on the views of other members of the Jehovah's Witnesses' faith as well as the prejudicial effect far beyond probative value of the examination on the personal beliefs of the plaintiff-witness. I therefore respectfully dissent.
 
 
 76
 * The majority opinion carefully relates most of the facts. It recites some, however, in bland generality. The record contains the following specifics:
 
 
 77
 Ray James Munn and his wife, both blacks, were residents of Tennessee. Ms. Munn was critically injured in an automobile accident in Mississippi by a vehicle driven by Trudy Algee, a white resident of Mississippi. After Ms. Munn's death, her husband could file suit only in Mississippi because Algee, an individual, was a resident of that state and did not do business in Tennessee. Instead of suing in state court, he invoked the constitutional and statutory grants of diversity jurisdiction, designed to protect nonresidents from the possible prejudice of state courts, to file suit in the United States District Court for Northern District of Mississippi, on his behalf and on behalf of Ms. Munn's three children.
 
 
 78
 Algee admitted liability, so the trial was only to determine damages. The case was tried before a jury of six; five of the jurors were white, one was black. Algee used all three of her peremptory challenges to exclude blacks.
 
 
 79
 The trial began on August 21, 1989, in Clarksdale, Mississippi. Two months earlier, on June 21, the Supreme Court in Texas v. Johnson[1] had reversed a state conviction for flag burning because the statute infringed first amendment rights. This event had evoked widespread publicity, both in print and on television. The Flag Protection Act, a federal bill to punish any desecration of the flag had been introduced in Congress on July 24, and was the subject of national publicity at the time of trial.
 
 
 80
 Munn testified both on direct and on cross-examination that he and his wife were Jehovah's Witnesses, that his wife had refused to take a blood transfusion because of her religious beliefs; that, after she lost consciousness, he rejected a transfusion because she and he both believed that, "even if it meant dying, you would not take that risk [of a blood transfusion] however small it was;" and that, "We don't waiver in our faith."
 
 
 81
 Counsel for the defendant then proceeded to cross examine him not on his or his wife's personal beliefs or faith, or on reasonableness of their opposition to transfusions, but on the general beliefs of those who profess to be Jehovah's Witnesses. Part of the cross-examination follows:
 
 
 82
 Q. Let me ask you this. Isn't it true that the Jehovah Witnesses' faith adheres to the belief that Christ returned to earth in 1914 and has invisibly ruled since that time through the Watchtower?
 
 
 83
 A. Through the organization here.
 
 
 84
 Q. The organization is the Watchtower?
 
 
 85
 A. Well, not the Watchtower. It's the one, the governing body of the Jehovah's Witnesses--of where the magazines come from.
 
 
 86
 Q. It is the belief in accordance with that of Jehovah's Witnesses that since Christ returned in 1914 there will not be a resurrection but there will be ultimately Armageddon and after Armageddon Christ will begin his ruling of the millennium and the Jehovah's Witnesses will be spared that and all others will be eternally damned; isn't that the belief of the Jehovah's Witnesses?
 
 
 87
 A. You stated that well.
 
 
 88
 Q. Is it the belief of the Jehovah's Witnesses that there is no hell for the wicked; the wicked will merely be annihilated?
 
 
 89
 A. That's what the scripture [sic] say.
 
 
 90
 Q. It is the belief of the Jehovah's Witnesses that man has no soul, and when man dies that the soul was merely a manifestation for the body during life; isn't that true?
 
 
 91
 A. Well, the soul is the breath and the life force combined along with it.
 
 
 92
 Q. It is the belief of the Jehovah's Witnesses that followers of Jehovah's Witnesses are not members of any earthly kingdom?
 
 
 93
 A. Well, you didn't state that correct.
 
 
 94
 Q. How would you state it?
 
 
 95
 A. There is--we--it's not an earthly kingdom. Christ is his invisible presence from the Scriptures ruled from the heaven, the heavenly kingdom, not an earthly kingdom.
 
 
 96
 Q. Is it based on that premise that Jehovah's Witnesses are, for instance, conscientious objectors toward service to their country; isn't that true?
 
 
 97
 A. Say that again.
 
 
 98
 Q. It is based on that premise of followers of this religion not being servants to any earthly kingdom upon which Jehovah's Witnesses base their belief that they are conscientious objectors and therefore do not do service to their country, like going to war?
 
 A. No, we don't go to war.[2]
 
 99
 Q. Is my statement correct?
 
 
 100
 A. Right. We don't go to war.
 
 
 101
 Q. It is on that same premise, or stated differently, that Jehovah's Witnesses, for instance, don't salute the flag because that would be ascribing salvation to the flag; isn't that true?
 
 A. Right. We don't salute the flag.[3]
 
 102
 Counsel for Algee also delved into another matter:
 
 
 103
 Q. It is also the teachings of the Jehovah's Witnesses faith that it is a sin against God to live together outside of wedlock, isn't it?
 
 
 104
 * * * * * *
 
 
 105
 Q. Included in the material that you have brought into court and that you referred to yesterday on direct examination, if you will turn to the page that I have the yellow tab on, please, sir. It is also the beliefs and teachings of Jehovah's Witness faith that a man and woman do not live together prior to marriage, isn't it?
 
 
 106
 A. That's right.
 
 
 107
 Q. But you and Mrs. Munn lived together prior to marriage, didn't you, in violation of the Scriptures and your teachings?
 
 
 108
 A. At the time I met her--
 
 
 109
 Q. Go ahead and answer yes or no, first, and then you may explain.
 
 
 110
 A. Yes, we did. Now, let me explain. When I met her she was not in the organization. As I explained to you earlier how someone is disciplined for certain things and if they show no sign of repentance, at that time they're disfellowshipped, she had left the organization when I met her. And I was not in the organization, didn't know anything about the organization. For a short period of time we did live together, but she did repent and go back into the organization. And I, myself, became a Jehovah's Witness.
 
 
 111
 Q. Are you saying that at the time you met her she had been disfellowshipped for some other transgression?
 
 
 112
 A. She had.
 
 
 113
 Counsel for Algee was careful to remind the jury of the Munns' sinful conduct in his closing argument. None of this, of course, had any probative value whatever as to any issue before the jury.
 
 II
 
 114
 Judge Smith agrees with me that the admission of this testimony was error. Indeed, considering who the parties were, the time and place of the trial, and the patent irrelevance both of the beliefs of other members of Munn's faith and the Munns' premarital relations, the error was in my opinion egregious. He concludes, however, that the effect of this evocation of patriotic passion, religious prejudice, and bias against premarital sexual conduct is completely dissipated because its admission did not affect a substantial right of the Munns.
 
 
 115
 Upon examining this method of analysis--rather than the standard of review the opinion dutifully recites--it is apparent that Judge Smith believes that Federal Rule of Evidence 103 requires an appellant complaining of evidentiary errors to demonstrate somehow that the exclusion of inadmissible evidence would have changed the result.[4] That is not the criterion set forth in Rule 103. We can never know whether, in the absence of error, the result would have differed; if that is what we require, then no appellant will ever be able to demonstrate prejudice from a trial error unless the error is so plain that the verdict is wrong as a matter of law. The question Rule 103 requires us to ask in civil cases is whether there is a realistic possibility that the error had more than a de minimis effect on the verdict.
 
 
 116
 The Supreme Court's decision in Kotteakos v. United States[5] still provides the seminal discussion of harmless error analysis. Kotteakos puts the test for whether a trial error is harmless in the negative. Paraphrased, the appellate court must be able to say "with fair assurance, after pondering all that happened ... that the judgment was not substantially swayed by the error."[6] The inquiry is not "merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the [verdict] cannot stand."[7]
 
 
 117
 As the Kotteakos Court explains, the purposes of the harmless error rule, as applied to all trial errors, not just evidentiary rulings,[8] are "simple[:] to substitute judgment for automatic application of rules," and to "preserve review as a check upon arbitrary action and essential unfairness in trials" without providing loopholes through which a litigant may escape the verdict in a fairly conducted trial.[9] If harmless-error review is faithfully to serve those purposes, then the reviewing court must keep firmly in mind the context in which its inquiry takes place. In determining whether an error is harmless, it is not the function of the appellate court to speculate on the probable result of a new trial. "Those judgments are exclusively for the jury."[10] Thus, error cannot be deemed harmless solely because the reviewing court believes that the trial court reached the correct result in spite of the error.[11] Rather, the focus of the inquiry is "what the error meant to the [jury], not singled out and standing alone, but in relation to all else that happened."[12] "[E]rror is not to be viewed in an attitude separate from reality and oblivious to the context of the record."[13] The judge must not equate the fact-trier's reactions with his own, but must allow for how others might react, within the bounds of reason.[14]
 
 
 118
 Kotteakos, of course, was a criminal case, and the Supreme Court has recognized that the harmless-error analysis conducted in criminal cases may be in some respects more stringent than harmless-error analysis in civil cases.[15] Nevertheless, this circuit has articulated a standard in civil cases substantially similar to that employed in Kotteakos : We must reverse unless we are " 'sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict.' "[16] It seems to me that one could only be "sure" of that if it appears from the record that there is no realistic possibility that the error had more than a de minimis effect on the verdict.
 
 
 119
 With that standard in mind, some would contend that, given the conditions under which this case was tried, errors like those committed in this trial warrant reversal per se.[17] Ms. Algee had admitted her liability. The jury was called upon to decide only the damages due Mr. Munn and his wife's children. In doing so, the jurors were asked to make four necessarily subjective determinations: (1) Whether Ms. Munn's refusal to take blood was reasonable; (2) What portion of Ms. Munn's damages were attributable to her unreasonable refusal to take blood; (3) What amount of damages would compensate Ms. Munn's estate for her pain and suffering; and (4) What amount of damages would compensate Mr. Munn for his pain and suffering. The jury's sympathy for or antipathy to the Munns might substantially affect their decision on each of these issues. I therefore see no way that a reviewing court could be "sure"--other than by substituting its own views for those of the jury or by inventing some post-hoc rationalization for the verdict--that Algee's appeal to the jury's religious prejudice and nationalism "had but slight effect" on the verdict. In this case, however, we need not go so far as to find error per se. Under the traditional analysis, this error could not have been harmless.
 
 III
 
 120
 The interrogatories submitted to the jury with respect to Ms. Munn and the jury's answers follow:
 
 
 121
 1. What amount of damages do you find plaintiff has proven by a preponderance of the evidence to have been incurred by Elaine Munn up to the time of her death for pain and suffering and mental anguish?
 
 
 122
 $10,000.00.
 
 
 123
 2. Do you find that defendant proved by a preponderance of the evidence that Elaine Munn would have survived had she accepted the blood transfusions?
 
 
 124
 Yes.
 
 
 125
 3. Do you find that defendant has proved by a preponderance of the evidence that Elaine Munn's refusal of blood transfusions was unreasonable?
 
 
 126
 Yes.
 
 
 127
 4. Do you find that the original injuries sustained by Elaine Munn combined with her unreasonable refusal of blood to cause her death?
 
 
 128
 Yes.
 
 
 129
 If your answer to this interrogatory is "Yes," what percentage did Elaine Munn's unreasonable refusal of blood contribute to her death?
 
 
 130
 100 percent.
 
 
 131
 No special interrogatories concerning Mr. Munn were submitted to the jury.
 
 
 132
 I do not understand the statement that "Munn failed to articulate any substantial right affected by this evidence's admission."[18] I cannot imagine a more explicit articulation than Munn's claim that the evidence "poisoned the minds of the jury [sic] from the outset," thus preventing him from obtaining an impartial assessment of the damages due. The inquiry, then, must focus on whether there was any realistic possibility that counsel for Algee succeeded in his calculated effort to "poison" the minds of the jurors and to affect their verdict through the erroneously admitted evidence.
 
 
 133
 Patently, it seems to me, the jury's view of whether Ms. Munn and her husband were honest, sincere, and responsible members of the community might have affected the amount of damages it awarded for Ms. Munn's pain and suffering before death, its view that her refusal of blood transfusions was or was not reasonable, and its evaluation of the conflicting testimony concerning whether her refusal to accept a transfusion was either the sole or even a cause of death. Judge Smith does not even intimate a different view. Instead, because he finds the verdict to be within what he considers a reasonable range, he grants absolution for the error.
 
 
 134
 Apparently, neither of my brothers accepts the view that any lawyer who has tried personal injury cases considers fundamental: the sympathy or disaffection the jury has for the victim affects the amount of damages. The Civil Trial Manual, published jointly by the American College of Trial Lawyers and the ALI-ABA Committee on Continuing Legal Education, speaking of the opening statement, says:
 
 
 135
 The force of the lawyer's efforts here should be to get the jury to think with him and to be favorably inclined toward his client, disclosing his age, occupation, marital status, number of children, if any, and so forth. The image of plaintiff or defendant as a hardworking family man or a devoted mother and housewife will give the jurymen an image to which they can relate.[19]
 
 
 136
 Dozens of other works instructing lawyers on the trial of cases give the same message.[20]
 
 
 137
 Instead of asking whether, absent the tainted testimony the jury might have awarded more, Judge Smith observes that the error did not result in an absurdly low verdict. "For approximately eight hours of pain and suffering, the jury awarded $10,000.00, an amount not so small as to arouse suspicion as to the jury's motives."[21] Yet the jury might have awarded a much larger amount. Apart from whether her death might have been averted, Ms. Munn suffered for eight hours from severe injuries. Her pelvis was fractured in two places. Her ribs were broken. She was bleeding profusely internally and suffered extensive internal bruising. Her physicians inserted a tube in her chest. They cut open her abdomen to insert lavage fluid. They cut open her chest and spread her ribs eight inches apart to clamp a lacerated artery.
 
 
 138
 The inadmissible evidence may well have induced the jury to award only $10,000. The issue is not whether the verdict arouses suspicion, but whether the Munns' substantial rights were affected, a much different question. Webster's Seventh New Collegiate Dictionary, defines the verb "affect" to mean "to produce an effect upon, to produce a material influence upon or alteration in, [or] to make an impression on." That is all Munn must demonstrate to show prejudice. He does not have to show that the jury acted with evil or even questionable intentions.
 
 
 139
 In like fashion, Judge Smith concludes that awarding Munn nothing for his own pain and suffering "most likely" reflects the relatively minor nature of his injuries. This conjectural determination of probability takes no account of the other possibility that I consider likely and with which I think most lawyers would agree: that a jury who considered Munn a patriotic, moral, sensible, and sympathetic person might well have awarded him thousands of dollars for the same infliction. None of us who sit on this court are virgins at the bar. We have all seen, and some of us have affirmed, substantial verdicts for "bruises and contusions." Indeed, I can conceive of no reason but general dislike of the plaintiff for a jury to award medical expenses against an admittedly liable defendant, but to award nothing for pain and suffering when the uncontroverted evidence was that Munn suffered pain and general discomfort from his "bruises and contusions" for several months.[22]
 
 
 140
 Judge Smith continues to pile a Pelion of conjecture upon an Ossa of speculation: "the jury's failure to award any wrongful death damages is the most plausible " explanation of its verdict; "the jury most likely refused" wrongful death damages "because it believed that Ms. Munn would have lived had she taken blood transfusions"--despite the fact, mentioned in a footnote, that one doctor testified that she would have died even had she done so, and another that there was a "75% possibility" that this would have occurred.[23]
 
 
 141
 At most, the opinion demonstrates only that the admission of the prejudicial testimony may have been harmless. Justice Frankfurter said that we as judges should not be ignorant of what we know as men.[24] Nor should we disregard what we know as experienced lawyers. We know that persuading the jury of the good character of the plaintiffs is likely to enhance their verdict, and that portraying them unfavorably tends to decrease it. Anecdote has it that the late Sammy Davis Jr., when about to play golf, was asked, "What is your handicap?" He replied, "I'm black, one-eyed and Jewish, and you still want to know my handicap?!" The Munns were quadruply handicapped--black nonresidents adhering to an unpopular faith, some of whose members were unpatriotic, trying a case before a north Mississippi jury, five of whose six members were white.
 
 
 142
 Judge Smith concludes that inducing this predominantly white Mississippi jury to believe or at least to infer that the Munns believed that Christ returned to earth in 1914 and has invisibly ruled since that time, that there will not be a resurrection but that the jury (like all others ever on earth save Jehovah's Witnesses) will be eternally damned, that Munn believes man has no soul, that Munn is a conscientious objector who will not expose himself to the dangers inherent in military service even when the nation is threatened, that the Munns even refuse to salute the flag, and that they lived together in adultery prior to their marriage all likely had no effect on the Munns' substantial rights. Judge Barksdale would go further and hold the testimony admissible. This to me, with all respect to both of my brethren, is contrary to the universal knowledge and experience of trial lawyers and judges, and to the human disposition to favor those we like and to discountenance those we disfavor. Algee's lawyer deliberately threw the proverbial skunk of inadmissible evidence into the jury box. No amount of conjecture that the jury might not have smelled the stink can undo the odor that, even now, permeates the record. I therefore respectfully dissent.
 
 
 
 [1]
 Munn also argues that Algee improperly used her peremptory challenges to exclude blacks from the jury. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). That assertion is foreclosed by our recent holding that Batson does not apply to suits between private parties. See Edmonson v. Leesville Concrete Co., 895 F.2d 218 (5th Cir.) (en banc), cert. granted, --- U.S. ----, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990)
 
 
 [2]
 Although Munn preserved error by objecting to the admission of this evidence, he does not directly appeal the evidentiary ruling. Munn cited this ruling as error in his new trial motion and instead appeals the unfavorable disposition of that motion. However, this does not affect the nature of our review. If Munn had simply appealed the adverse evidentiary ruling, we would have asked (1) whether the district court abused its discretion in admitting the evidence and (2) if so, whether such abuse affected a substantial right. Because the district court responded to Munn's new trial motion by reiterating its belief in the correctness of its initial ruling, we apply the same two-step analysis even though the error was raised through the conduit of a new trial motion. See generally 1 S. Childress & M. Davis, Standards of Review Sec. 5.8 at 327 & n. 35 (1986)
 
 
 [3]
 Algee's brief asserts that this questioning responded to Munn's testimony on direct examination concerning "how zealously he and the decedent followed these teachings." In explaining its decision to admit the testimony, the court observed that "the plaintiff in his direct examination professed his very strong feelings about his faith."
 
 
 [4]
 The reasonableness of Mrs. Munn's decision is most definitely a fact of consequence, for Algee invoked the doctrine of avoidable consequences, which precludes recovery for injuries that an injured plaintiff might reasonably have avoided. See infra part IV
 
 
 [5]
 Algee may have sought to imply that, in her view, because the entire religion is unreasonable, any decision made in accordance therewith is per se unreasonable. However, United States v. Ballard, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944), which bars adjudication of a religion's reasonableness, forbids a jury from relying upon this argument
 
 
 [6]
 We further conclude that the district court abused its discretion in deciding that the probative value of this evidence outweighed its potential for prejudice. Fed.R.Evid. 403. Although we appreciate the potential for prejudice that this evidence carried, our conclusion in this regard follows primarily from its utter irrelevance
 
 
 [7]
 In Stitt Spark Plug Co. v. Champion Spark Plug Co., 840 F.2d 1253, 1258-59 (5th Cir.), cert. denied, 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988), we held that the erroneous failure to admit certain evidence was not reversible partly because the proponent had not shown how the error caused prejudice
 
 
 [8]
 Dr. W. Alan Walker testified that Mrs. Munn would have survived had she accepted the blood transfusions. Dr. Timothy Fabian testified that there was a 90-95% chance that she would have lived had she taken blood. On the other hand, Dr. Earnest Payne, Jr., testified that she would have died even had she taken the blood. Dr. Joseph Sapala stated that there was a 75% possibility that Mrs. Munn would have died even if she had accepted the blood
 
 
 [9]
 Under Mississippi law, an injured plaintiff may not recover for damages that he did not take reasonable efforts to avoid. Buras v. Shell Oil Co., 666 F.Supp. 919, 924 (S.D.Miss.1987) (applying Mississippi law); Pelican Trucking Co. v. Rossetti, 251 Miss. 37, 167 So.2d 924, 927 (1964), overruled in part, sustained in part, 251 Miss. 37, 170 So.2d 573 (1965); National Dairy Prods. Corp. v. Jumper, 241 Miss. 339, 130 So.2d 922, 923 (1961); Levy v. J.A. Olson Co., 237 Miss. 452, 115 So.2d 296, 298 (1959); Vining v. Smith, 213 Miss. 850, 58 So.2d 34, 34 (1952); Yazoo & M.V.R. v. Fields, 188 Miss. 725, 195 So. 489, 490 (1940); Tri-State Transit Co. v. Martin, 181 Miss. 388, 179 So. 349, 350 (1938); North Am. Accident Ins. Co. v. Henderson, 180 Miss. 395, 177 So. 528, 530 (1937); Mars v. Hendon, 178 Miss. 157, 171 So. 880, 883 (1937); Scott & Garrett v. Green River Lumber Co., 116 Miss. 524, 77 So. 309, 310 (1918). Courts frequently use the phrases "avoidance of consequences" and "mitigation of damages" interchangeably
 
 
 [10]
 The court stated that "[t]he jury is going to be called upon to determine the reasonableness of their beliefs considering their religion as one of the factors." Later in the proceedings the court similarly declared that "[o]ne of the issues for the jury to decide is the reasonableness of the deceased, presumably Mr. Munn's decision, based on their belief in the Jehovah's Witness doctrine."
 
 
 [11]
 Munn's brief concedes as much
 
 
 [12]
 However, we urge the district courts to apply the "objective" approach to religiously motivated refusals to mitigate damages, for that approach plainly violates neither the free exercise clause nor the establishment clause
 
 
 [13]
 The combined effect of this conclusion and the avoidable consequences doctrine is at least superficially harsh: Mrs. Munn's estate and her husband and children are unable to recover either the damages she would have suffered or wrongful death damages. The district court, perceiving unfairness, crafted a jury instruction that allowed the jury to award wrongful death damages even if it found that Mrs. Munn's refusal to accept blood was unreasonable and that she would have lived had she accepted the blood. We reject this approach. See infra note 16
 
 
 [14]
 Even if we were inclined to extend application of the doctrine to pre-existing "mental" conditions (as Munn characterizes his wife's religious beliefs), the situation in this case is distinguishable from one in which the defendant's negligence aggravates some pre-existing psychological defect (e.g., where a car accident makes an already paranoid plaintiff even more so). Algee's negligence did not aggravate some pre-existing mental illness; rather it put Mrs. Munn in a situation in which she felt obliged to follow one of her beliefs
 
 
 [15]
 See also Robles v. Exxon Corp., 862 F.2d 1201, 1204 (5th Cir.) cert. denied, 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 434 (1989); Nance v. Gulf Oil Corp., 817 F.2d 1176, 1178 (5th Cir.1987); Perricone v. Kansas City S. Ry., 704 F.2d 1376, 1379 (5th Cir.1983)
 
 
 [16]
 The court instructed the jury to "determine the percentage of wrongful death damages attributable to Elaine Munn's refusal to accept the transfusions," allowing it "to place this percentage at 0%, 100%, or any percentage in between." In its opinion denying Munn's motion for a new trial, the court noted that it instructed the jury "that even if it found that Mrs. Munn's death was avoidable and that her refusal of the blood transfusion was unreasonable, it could still award the plaintiff wrongful death damages, if it further found that the defendant's negligence was a contributing cause of Mrs. Munn's death." The interrogatory challenged in this appeal corresponds to this instruction
 We reject this approach. Apportioning wrongful death damages is inconsistent with the mitigation of damages doctrine. If a jury finds that a certain consequence of the defendant's negligence could reasonably have been avoided by the plaintiff, the plaintiff cannot recover for that consequence. The bar on recovery is total; retreating to notions of causation is inappropriate in light of the purposes of the doctrine, which are to encourage plaintiffs to reduce the societal costs of their injuries and to ensure fair treatment of defendants. That the defendant's negligence may have caused the avoidable injury is irrelevant. See 2 M. Minzer, J. Nates, C. Kimball, D. Axelrod & R. Goldstein, Damages in Tort Actions Sec. 16.00 (1989); Restatement (Second) of Torts Sec. 918 comment (a) (1977) (observing that in cases covered by Sec. 918, "it is not true ... that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm"); Stein, Damages and Recovery: Personal Injury and Death Actions Sec. 126 (1972) (noting that rule is grounded in public policy (not causation)). Contra Corlett v. Caserta (where "the patient exercises his fundamental and religious right to refuse a reasonable life-saving medical procedure and subsequently dies, the patient's estate should bear a proportionate share of tort liability for the patient's wrongful death to the extent that the patient's death was proximately caused by the patient's refusal of the reasonable life-saving treatment").
 The mitigation doctrine is designed to operate in precisely this kind of situation, i.e., where the defendant's negligence concededly caused all of the plaintiff's injuries, some of which might reasonably have been avoided by the injured plaintiff. There is no need for a doctrine that precludes recovery only where "the defendant's negligence was [not] a contributing cause" of damages that might reasonably have been avoided by the plaintiff; causation principles prevent imposition of liability on the defendant therefor.
 Although we understand the district court's desire to prevent the arguable unfairness of the result, we note that Munn's inability to recover neither wrongful death damages nor hypothetical damages flows from Mrs. Munn's own behavior, which was deemed unreasonable by the jury. If she had acted reasonably, she would have survived (according to the jury), and thus wrongful death would not have been an issue in the case. (Had she acted reasonably and not survived, her wrongful death beneficiaries would have been able to recover, since death would not have been an avoidable consequence.) Had she acted reasonably and lived, she would have been able to recover for pain, suffering, medical expenses, and lost wages.
 
 
 [17]
 See supra note 8
 
 
 [18]
 Incidentally, Munn could argue that Mrs. Munn was "powerless" to mitigate her damages. However, she was not "powerless" to accept blood transfusions in the sense that the plaintiff in Henderson was "powerless" to pay for the operation. There is a difference between hard choices and physical impossibility
 
 
 [19]
 At the same time, however, neither Henderson nor any other Mississippi case mandates a purely subjective approach to reasonableness
 
 
 [20]
 That Mississippi law allows a court to permit a jury to consider personal attributes in determining reasonableness does not in any way undermine our observation that jury consideration of religious beliefs may violate the establishment clause
 
 
 [1]
 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)
 
 
 [2]
 Emphasis added
 
 
 [3]
 Emphasis added
 
 
 [4]
 At 572-574
 
 
 [5]
 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)
 
 
 [6]
 Id. at 765, 66 S.Ct. at 1248
 
 
 [7]
 Id
 
 
 [8]
 28 U.S.C. Sec. 2111 (1988); Fed.R.Civ.P. 61; Fed.R.Crim.P. 52(a); Fed.R.Evid. 103(a)
 
 
 [9]
 Kotteakos, 328 U.S. at 759-60, 66 S.Ct. at 1245
 
 
 [10]
 Id. at 763, 66 S.Ct. at 1247
 
 
 [11]
 See 11 C. Wright & A. Miller, Federal Practice & Procedure Sec. 2883 at 278-79 (1973)
 
 
 [12]
 Kotteakos, 328 U.S. at 764, 66 S.Ct. at 1248 (emphasis added)
 
 
 [13]
 United States v. D'Antonio, 362 F.2d 151, 155 (7th Cir.), cert. denied, 385 U.S. 900, 87 S.Ct. 204, 17 L.Ed.2d 131 (1966)
 
 
 [14]
 Kotteakos, 328 U.S. at 764, 66 S.Ct. at 1247
 
 
 [15]
 Id. at 762-63, 66 S.Ct. at 1246-47
 
 
 [16]
 At 573 (quoting Pregeant v. Pan Am. World Airways, Inc., 762 F.2d 1245, 1249 (5th Cir.1985))
 
 
 [17]
 Cf. Note, Arguments Appealing to Racial Prejudice: Uncertainty, Impartiality, and the Harmless Error Doctrine, 64 Ind.L.J. 375 (1989)
 
 
 [18]
 At 573
 
 
 [19]
 R. Figg, R. McCullough, III, and J. Underwood, Civil Trial Manual 397-98 (1974)
 
 
 [20]
 See, e.g., A. Julien, Opening Statements Sec. 6.06 (1980); F. Lane, Goldstein Trial Techniques Sec. 10.45 (1984); M. Roberts, Trial Psychology 106-07 (1987); T. Sannito & P. MacGovern, Courtroom Psychology for Trial Lawyers 67 (1985); L. Smith & L. Malandro, Courtroom Communication Strategies Sec. 7.28 (1985); J. Warsaw, Masters of Trial Practice Secs. 3.11, 6.12, 15.4 (1985)
 
 
 [21]
 At 574
 
 
 [22]
 Cf. Comeaux v. Poindexter, 527 So.2d 1184 (La.App. 3d Cir.1988) ($250 damages for pain and suffering for "minor contusions"); Vidrine v. Government Employees Ins., 528 So.2d 765 (La.App. 3d Cir.1988) ($600 damages for pain and suffering for "minor injuries"); Soudelier v. Miller, 537 So.2d 296 (La.App. 1st Cir.1988) (four plaintiffs recovered damages for pain and suffering in the amount of $2500, $250, $250 and $500 respectively for "minor injuries"). See generally, Quantum Study, 35 Loy.L.Rev. 1151 (1990)
 
 
 [23]
 At 573 & n. 7
 
 
 [24]
 Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1357, 1357, 93 L.Ed. 1801 (1949)