BARNES, J.,
for the Court:
¶ 1. In this wrongful-death action, Plaintiffs claim that Manhattan Nursing & Rehabilitation Center (Manhattan) caused Mable Allen’s death by allowing Allen to become severely dehydrated at the nursing home.[1] Plaintiffs’ theory at trial was that Allen was in such poor condition as a result of Manhattan’s negligence, nothing could be done to counteract her dehydration when she was transferred to the University of Mississippi Medical Center (UMC). After a four-day trial in the Hinds County Circuit Court, the jury returned a $1,213,300 verdict against Manhattan. The verdict was later reduced to $513,300.[2]
¶ 2. Manhattan appeals the jury verdict, raising the following issues: (1) the trial court erred in excluding evidence about the decision made by Allen’s family to withhold medical treatment at the hospital, and this evidence was relevant to the proximate cause of Allen’s death, since it was an intervening, superseding cause, and it was relevant to the mitigation of dam *812 ages; (2) Manhattan was denied a substantial right when the trial court prevented Manhattan from impeaching Plaintiffs about decisions they made to withhold medical treatment from Allen at the hospital after Plaintiffs testified on direct examination that “there were no decisions” to be made concerning Allen’s medical treatment; (3) the trial court erred in preventing Manhattan from questioning Allen’s physician expert about a medical record signed by Allen’s treating physician that directly related to the proximate cause of Allen’s death and the mitigation of damages, and another medical record signed by Allen’s treating physician that contradicted the opinions of Allen’s expert; (4) the trial court erred when ⅛ allowed Plaintiffs to testify about out-of-court hearsay statements allegedly made by Allen’s physicians; (5) the trial court erred by striking two jurors “for cause” who stated they would be impartial; (6) the trial court erred by overruling Manhattan’s Batson[3] challenges; (7) the evidence was overwhelmingly in favor of Manhattan; and (8) the trial court erred in allowing the jury to consider damages for Allen’s pain and suffering when there was no evidence of such. Finding reversible error with the trial court’s exclusion of certain evidence relating to the Allen family’s decision to withhold medical treatment while at UMC and the admission of hearsay testimony, we reverse and remand for a new trial.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 3. Allen was a resident of Manhattan, located in Jackson, Mississippi, for over seven years-from July 17, 2001, until November 16, 2008. When Allen was admitted to the nursing home, she was seventy-six years old, and when she passed away on November 18, 2008, she was eighty-four years old.
¶ 4. Her treating physician, Dr. Cassandra Thomas, had originally recommended Allen go to the nursing home for six months to get her diabetes under control and for post-spinal surgery strengthening. At the time of admission, Dr. Thomas had also diagnosed Allen with dementia.
¶ 5. In February 2006, Dr. Thomas diagnosed Allen with advanced dementia, and in July 2006, with end-stage dementia. In July 2007, Allen had an episode of hypoglycemia and dehydration related to her diabetes. She was admitted to a local hospital, where she received intravenous fluids. Allen was released two days later.[4]
¶ 6. By 2008, Allen could no longer walk, communicate, feed herself, or control her bowels or bladder due to her progressive dementia.[5] She was a “total care” resident of Manhattan. The events at issue in this case began on Saturday, November 15, 2008. Tori Hinton, a licensed practical nurse at Manhattan who cared for Allen on a regular basis, testified that Allen refused to eat breakfast and lunch. Allen also spit out her medications that day. The nursing staff attempted to notify Dr. Thomas several times by pager and telephone call. When they did not receive a response, they contacted the “on-call *813 physician,” Dr. Sullivan. He instructed Manhattan to withhold Allen’s diabetic medication until she could be evaluated on Monday. Manhattan complied with the physician’s order. Allen’s vital signs were not taken on this day, as she was not showing any symptoms of low or high blood sugar, or breathing difficulty. Hinton also notified another of Allen’s daughters, Butler, who came to the facility and was also unable to get her mother to eat. Hinton stated that Allen did drink two four-ounce “Med Pass” nutritional supplements on November 15, with protein powder added to them. Hinton maintained that when Allen refused food and medication it was not an “emergency situation”; however, it was unusual, because Allen was normally a “good eater.”
¶ 7. The next day, Allen again spit out her breakfast and medications. She also refused lunch. Allen, however, did not appear to be in any distress. Again, the family was called, and Butler arrived at Manhattan. Butler testified she found her mother slumped in her geri-ehair, and it looked like someone had “cut mama” on the neck, because there was a “big gash” on her neck, and “her head [was] just wobbling.” Butler became “hysterical” and called her sister, Pace, and her niece. In response to Butler’s hysteria, Hinton paged Linda Owens, a registered nurse at Manhattan. When Owens arrived in Allen’s room, she found Allen had a rash of unbroken skin that had developed in a crease of Allen’s neck. An assistant nurse said she had noticed the rash that morning, after Allen had been bathed and put in the geri-chair. Even so, Pace demanded that 9-1-1 be called and Allen transferred to UMC. Manhattan complied, calling an ambulance. Hinton and Owens testified that Allen was not in any distress at the time, nor did she appear dehydrated.
¶ 8. When the emergency medical technicians arrived at the nursing home, they found Allen’s vital signs (blood pressure, pulse, and respiration) were within normal limits. Therefore, the EMTs did not administer IV fluids to Allen on the way to the hospital. The ambulance report indicated that Allen was in no acute distress while being transferred to UMC. Upon arrival at the UMC emergency room (ER), Allen’s chief complaints were the neck rash and “difficulty feeding.” Medical records show one of Allen’s daughters provided her history: Allen is normally not very responsive and has seemed “slightly less alert than usual.” It was noted Allen has dementia and “complete aphasia,” or cannot speak. Her vital signs were “baseline.” An ER physician found Allen was in “no acute distress” and responded only to deep pain. The ER made an initial assessment of “dehydration, hyperglycemia, and thrombocytopenia.”[6] Thus, IV fluids were administered. An ER admission/transfer order stated Allen was diagnosed with “thrombocytopenia, sepsis, and a UTI.”
¶ 9. Allen’s blood pressure began to drop within an hour of arrival at the ER. Allen was admitted to the hospital in critical condition. Numerous medical records show Allen was designated a “Do Not Resuscitate” (DNR) patient, and this status was confirmed by the family; thus, “no invasive procedures or central lines and no ‘pressors’ ” were to be administered.[7] On *814 November 17, Allen’s respiratory status worsened, but the family also refused deep suctioning.[8]
¶ 10. On November 18, 2008, two days after being admitted to UMC, Allen passed away. UMC medical records state her cause of death was “hypercapnic respiratory failure likely secondary to a urinary tract infection and acute renal failure.” There was no mention of dehydration.
¶ 11. In July 2009, Plaintiffs filed their complaint alleging that Allen experienced pain and suffering and ultimately died as a result of Manhattan’s negligence.[9] During a hearing on pretrial motions, the trial court granted Plaintiffs’ motion in limine and prevented Manhattan from entering evidence that would show Plaintiffs were contributorily negligent. In arguing the motion, Manhattan informed the trial court that it did not seek to assign negligence to the family, but instead sought to show how the family’s decision to withhold medical treatment from Allen was an intervening cause that broke the causal chain of attributing harm by Manhattan. However, the trial court disagreed, ruling that any evidence concerning the decision by Allen’s family to withhold treatment from Allen was inadmissible, including her status as a DNR patient.
¶ 12. The four-day trial began in September 2011. Plaintiffs focused solely on the last three days of Allen’s stay at Manhattan and then at UMC. They claimed that Manhattan improperly failed to take Allen’s vital signs when she began spitting out her food and medications on November 15, and that if the vitals had been taken, the Manhattan nursing staff would have recognized that Allen was dehydrated; Allen would have been taken to the hospital sooner and, thus, been easier to treat. The defense argued that Allen’s death resulted not from dehydration but from end-stage dementia, which caused Allen’s organs to stop working;
¶ 13. During Plaintiffs’ case-in-chief, Pace testified that an ER physician told her Allen “would not last more than 24 hours,” so there were “no decisions” for the family to make. The defense sought to impeach her testimony by showing contradictory evidence of the DNR designation, and the family’s refusal of certain treatment for Allen at UMC, but the trial court vehemently denied the request.
¶ 14. Laura Clark, the director of nursing during the time Allen was at Manhattan, testified via deposition as an adverse witness for Plaintiffs. Clark stated that in 2008, Allan was a “swallowing risk,” could not make her needs known, and had severely impaired cognitive skills. She had also had a dehydration-risk assessment performed as late as October 2008, which found her at high risk. However, Clark *815 maintained that Allen’s care plan complied with Manhattan’s policies and procedures.
¶ 15. Dr. Christopher Davey, Plaintiffs’ physician expert in geriatric and family medicine, testified that Manhattan failed to meet the standard of care for treatment of Allen. Dr. Davey opined that Manhattan’s breach caused Allen’s death by dehydration, and if Manhattan had properly monitored Allen and sent her to UMC on November 15, instead of November 16, she would have been easily treated with IV fluids. Additionally, Dr. Davey opined that while Allen “probably” had end-stage dementia, she was not actively dying from it, but instead suffered a drastic crash over the course of a few days before her death. He testified that Allen had no distress during her last days at Manhattan and at UMC because she had “reduced consciousness,” since she had not eaten or drunk anything in two days.
¶ 16. Lou Ann Alexander, a registered nurse, testified as Manhattan’s expert in geriatric nursing. It was her opinion Manhattan complied with the standard of care for treating and hydrating Allen. From a nursing standpoint, Alexander testified, Allen’s nursing-home records, vital signs, and condition at UMC would not indicate dehydration.
¶ 17. Dr. Sharon Brangman, Manhattan’s physician expert witness, testified that dementia always results in death, and it was her opinion Allen’s cause of death was end-stage dementia. She also opined that Manhattan satisfied the appropriate standard of care. She stated that while initially Allen’s vital signs were stable at UMC, it was only after Allen was given IV fluids that her blood pressure began to drop drastically, and she experienced acute distress. Dr. Brangman opined that Allen was actually not dehydrated, but because her kidneys were not working well, her body quickly became overloaded with fluid from the IVs, and she “took a turn for the worse.” Medical records show fluid accumulated in her lungs, which caused Allen to produce “pink, frothy sputum” on November 17.
¶ 18. However, due to the trial court’s grant of Plaintiffs’ motion in limine, prohibiting Manhattan from admitting or referencing any evidence showing the family withheld medical treatment, or that Allen was designated a DNR patient, the trial court deemed the following evidence Manhattan sought to introduce inadmissible. In August 2008, Pace, Allen’s daughter, who served as Allen’s “responsible party” at the nursing home, signed a document entitled “Do Not Resuscitate,” designating Allen as a “DNR” patient. Dr. Thomas signed the document, which stated Allen was a “resident [with] a terminal condition” (end-stage dementia). Several medical records from UMC also showed Allen was a DNR patient. On November 16, 2008, when Allen’s vital signs weakened following the administration of IV fluids, the UMC medical staff charted a conversation with Allen’s family that specified they did not want any invasive procedures, such as central venous lines or “pressors” for Allen. Similarly, on November 17, the family informed Allen’s physician that their mother would not want any “code drugs, pressors, chest compressions, defl-. brillation or mechanical ventriculation.” Also on November 17, while at UMC, a UMC “on-call” physician’s note stated that Allen was producing pink, frothy sputum; therefore, fluids were withheld until the physician could examine her. The physician noted: “After discussion with family, agreed to hold [patient’s] fluids, preventing ... worsening respiratory status and keeping [patient] comfortable. Family REFUSED for [patient] to have any more deep suction. Wishes honored.” Instead, the family asked for Allen to be made as *816 comfortable as possible. Due to the trial court’s ruling, Manhattan could not show these records to the expert or publish them to the jury because the records discussed the family’s decision to withhold treatment from Allen.
¶ 19. Other UMC ER records showed Allen was a DNR patient, and “no invasive procedures or central lines, and no pres-sors” were to be used. In a proffer outside of the jury’s presence, Dr. Davey agreed that the family “basically let her die.” In his opinion, Allen’s dehydration caused her to suffer hypovolemic shock at UMC. However, Dr. Davey agreed that IV fluids and vasopressors were the “mainstay treatments of hypovolemic shock,” and will bring a person’s blood pressure back up to normal. Manhattan argues this medical evidence was highly relevant to counter Plaintiffs’ theory of liability against Manhattan at trial.
¶ 20. After the jury returned a $1,213,300 verdict in favor of Plaintiffs, with noneconomic damages of $1,200,000 and economic damages of $13,300, Manhattan moved to reduce the verdict under section 11-1-60.[10] The trial court granted the motion, and the verdict was reduced to $513,300. The trial court denied Manhattan’s motion for a new trial or, alternatively, a judgment notwithstanding the verdict (JNOV). Manhattan appealed. Plaintiffs cross-appealed, arguing that the trial court erred in granting Manhattan’s motion to reduce the jury verdict under section 11-1-60 because the statute is unconstitutional.[11]
STANDARD OF REVIEW
¶ 21. Manhattan appeals the trial court’s denial of its motion for a new trial or, alternatively, for a JNOV. An appellate court reviews a trial court’s grant or denial of a motion for a new trial for abuse of discretion. Ballard Realty Co. v. Ohazurike, 97 So.3d 52, 58 (¶ 13) (Miss.2012) (citing United Servs. Auto. Ass’n v. Lisanby, 47 So.3d 1172, 1176 (¶9) (Miss.2010)). Likewise, the admission or exclusion of evidence is reviewed under an abuse-of-discretion standard of review. Id. (citing Rebelwood Apartments RP v. English, 48 So.3d 483, 490 (¶ 33) (Miss.2010)). “Where error involves the admission or exclusion of evidence, [the appellate court] will not reverse unless the error adversely affects a substantial right of a party.” Lisanby, 47 So.3d at 1179 (¶ 25) (quoting Whitten v. Cox, 799 So.2d 1, 13 (¶ 27) (Miss.2000)). A trial court’s denial of a motion for a JNOV is reviewed de novo. Id. at 1176 (¶ 8). A motion for a JNOV “tests the legal sufficiency of the evidence supporting the verdict [and] asks the [reviewing court] to hold, as a matter of law, that the verdict may not stand.” Watts v. Radiator Specialty Co., 990 So.2d 143, 150-51 (¶ 21) (Miss.2008).
ANALYSIS OF THE ISSUES
¶ 22. Manhattan argues, on appeal that the trial court made a “litany of errors” *817 that highly prejudiced the defense at trial. Manhattan explains that its theory of the case at trial centered on the fact that Allen had a debilitating disease — dementia— which had progressed to a terminal condition by 2008. Plaintiffs, in contrast, claimed Allen’s condition was not worsening and that she died as a result of dehydration caused by Manhattan, and, by the time Allen arrived at UMC, nothing could be done.
¶ 28. We find reversible error with the trial court’s exclusion of evidence about the family’s withholding certain medical treatment from Allen while at UMC, which impacted substantial rights of Manhattan to present its version of the case. Additionally, we find the trial court improperly allowed Plaintiffs to present hearsay testimony about Allen’s condition during her admission at UMC. Because the Court reverses on these grounds, there is no need for us to discuss Manhattan’s remaining issues. Further, we will not address the constitutionality of section 11-1-60(2), which was raised in Plaintiffs’ cross-appeal. See State v. Watkins, 676 So.2d 247, 249 (Miss.1996) (quoting Jones ex rel. Jones v. Harris, 460 So.2d 120, 122 (Miss.1984)) (“Courts have a solemn duty to avoid passing upon the constitutionality of any law unless compelled to do so by an issue squarely presented to and confronting a court in a particular case.”); see also Barr v. Matteo, 355 U.S. 171, 206, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957) (quoting Eccles v. Peoples Bank of Lakewood Vill., Cal, 333 U.S. 426, 432, 68 S.Ct. 641, 92 L.Ed. 784 (1948)) (“Courts should avoid passing on questions of public law even short of constitutionality that are not immediately pressing.”).
I. Exclusion of Evidence
¶24. Manhattan argues it was “hamstrung” at trial in presenting its theory of the case to the jury due to the trial court’s excluding evidence of the family’s decision to refuse certain treatment for Allen at UMC, which would contradict Plaintiffs’ case.
¶ 25. Plaintiffs’ motion in limine asked the court to prevent “[a]ny attempt by Defendants to demonstrate and/or insinuate that ... any of the Plaintiffs ... are somehow contributorily negligent for the damages suffered by Mable Allen.” At the hearing on the motion, counsel for Manhattan represented that “it is not our position to say that the family was contribu-torily negligent because frankly we don’t believe anyone was negligent when it came to her death. But certainly we do want to argue that that is a breach of the causal chain insofar as Plaintiffs’ allegations that Manhattan caused some harm.” Manhattan explained that it. was important to introduce, not necessarily the DNR order, but the withholding of treatment, especially vasopressors, to reverse hypovolemic shock, as a contributory cause of Allen’s death. The trial court ruled that unless Manhattan had caselaw that said a. DNR designation could be a superseding cause to absolve a party from liability, the evidence, including that of vasopressors, would be inadmissible.
¶ 26. Defense counsel cited to the trial judge Munn v. Algee, 924 F.2d 568 (5th Cir.1991), in support of Manhattan’s argument to show the relevance of the decisions made by Allen’s, family about her treatment. In Munn, the plaintiff sued for injuries his wife sustained in an automobile accident. Id. at 571. The plaintiff also asserted a wrongful-death claim because his wife died while receiving treatment for her injuries. The evidence at trial showed the wife declined a blood transfusion due to religious beliefs; the blood was needed during surgery. She died during the operation. At trial, the *818 defendant presented medical evidence that the proposed blood transfusion would have prevented the decedent’s death. Id. at 573. Therefore, the trial court allowed the jury to consider this evidence as a factor contributing to her death. The jury awarded damages to the plaintiff for the injuries the wife sustained during the accident, but did not award damages for the wrongful-death claim. On appeal, the verdict was affirmed for both determinations. The appellate court determined that “the jury most likely refused to compensate the wrongful-death beneficiaries because it believed that [the wife] would have lived had she taken blood transfusions.” The United States Court of Appeals for the Fifth Circuit found the jury determination reflected “the entirely plausible view that although both the injury and the refusal were causal factors in [the wife’s] death, she would have survived had she taken the blood.” Id. at 577.
¶ 27. The trial court rejected Manhattan’s argument and denied the admission of any documents related to the decision by Allen’s family to withhold medical treatment.[12] We find that Munn is predicated on the “avoidable-consequences doctrine,” under which an injured plaintiff is not allowed to recover for damages that he did not take reasonable efforts to avoid. Id. at 571, 573 n. 9. As the Munn court explained, the phrases “avoidable consequences” and “mitigation of damages” are frequently interchanged. Id. at 573 n. 9.
¶ 28. Here, one of Manhattan’s primary contentions is that the Allen family’s decision to refuse certain medical care was also relevant to mitigation of damages. A plaintiff “is required to take reasonable steps to mitigate his damages.” Id. at 578-79 (quoting Bums v. Shell Oil Co., 666 F.Supp. 919, 924 (S.D.Miss.1987)). This legal principle “deals not with the conduct of a plaintiff contributing to his injury, but with his failure to avoid the consequences of his injury after it has been inflicted, to avoid or diminish the damages resulting from his injury.” Yazoo & M.V.R. Co. v. Fields, 188 Miss. 725, 732, 195 So. 489, 490 (1940). The Allen family’s refusal of treatment was relevant to the issue of whether Plaintiffs failed to mitigate their damages. The trial court abused its discretion in prohibiting the evidence for this purpose.
¶ 29. Caselaw from other jurisdictions does acknowledge that a DNR designation may be considered by the jury in determining proximate or superseding cause. In State v. Smith, 835 N.W.2d 1,'8 (Minn. 2013), the Minnesota Supreme Court affirmed the conviction of the defendant for criminal vehicular homicide. However, the jury was allowed to consider evidence on whether the victim’s DNR order was a superseding cause of her death. Id. at 7-8. In the weeks following the accident, the elderly victim’s health and mental functioning deteriorated while in the hospital and a nursing home, and she began to suffer from acute respiratory failure. Id. at 3-4. Because of the victim’s DNR designation, however, the physicians refused to place her on respiratory support, and she passed away. Id. at 4. Testimony from the victim’s physician stated that had she been intubated, she would have continued to live, but a treating physician also testified there was no guarantee anyone would live with the procedure. The jury found the DNR designation was not the “sole” cause of the victim’s death, as required by law in Minnesota, and thus the DNR was not a superseding cause of her death. Id. at 8. The Minnesota Supreme Court “decline[d] to adopt the State’s ar *819 gument that a victim’s refusal of medical care may never, as a matter of law, be a superseding cause of death.” Id. at 7. Instead, the court found “the existence of a superseding cause may be a question of fact for the jury if the evidence is such that reasonable minds could differ on the question.” Id.
¶ 30. Similarly, in Hicks v. LeClair, No. 9:07-CV-0613, 2008 WL 5432217 (N.D.N.Y. Dec. 30, 2008), the district court dismissed the petitioner’s request for a writ of habeas corpus. Id. at *4. The underlying facts are that the defendant shot the victim in the face at point-blank range with a sawed-off shotgun. Id. at *1. At the hospital, the victim’s family asked for a DNR order and forewent the use of antibiotics. Id. The victim died thirteen days later from pneumonia. Id. At trial, the medical examiner testified for the state that the victim’s wounds would have never healed, infection was inevitable, and thus the shotgun blast to her face caused her death. Id. The defendant’s expert pathologist countered that had the victim received antibiotic therapy, she might have lived, and that “the action of the victim’s family in ordering a DNR was a supervening cause which broke the chain of causation between the shotgun blast and the victim’s death.” Id. On appeal, the defendant’s conviction for murder was affirmed because the court could not conclude the victim’s death was solely attributable to the victim’s decision to forego medical treatment for infection, as is required by law. Id. at *2.
¶ 31. Manhattan argues that the jury should have been allowed to determine whether the decision by Allen’s family to refuse certain treatments proximately caused her death. We agree. “The proximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury, and without which the result would not have occurred.” Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc., 519 So.2d 413, 417 (Miss.1988) (citation omitted). If “another acting independently and of his own volition puts in motion another intervening cause which efficiently leads in unbroken sequence to the injuries,” then the intervening cause “is the proximate cause.” Hoke v. W.L. Holcomb & Assocs., 186 So.2d 474, 477 (Miss.1966).
¶32. At trial, Plaintiffs claimed that Manhattan’s alleged medical negligence was the sole proximate cause of Allen’s death. Thus, the family’s refusal of certain medical care was relevant to the issue of causation. It was error for the trial court to prohibit the jury from hearing that the family withheld vasopressors and fluids from Allen, especially since Dr. Da-vey, Plaintiffs’ physician expert, would have testified that these treatments usually resolve hypovolemic shock caused by dehydration, which is the diagnosis he gave Allen.[13] Since the jury was charged with determining the cause of Allen’s death, it should have been allowed to consider whether the refusal of these treatments contributed to her death.
¶ 33. Further, we find that Manhattan’s right of cross-examination was severely impacted by the trial court’s ruling. The right to cross-examine a witness is the “ultimate safeguard” to prevent the jury from relying solely on a “distorted or prejudicial impression” of the case. Rebelwood Apartments, 48 So.3d at 491 (¶¶ 36-37). At trial, Plaintiffs told the jury that *820 UMC physicians stated Allen “would not last more than 24 hours” when she arrived at UMC on November 16, 2008, due to severe dehydration.[14] On direct examination, Pace testified that there were “no decisions to make” that would impact Allen’s outcome, due to her dehydrated state upon arrival at UMC. Manhattan notes that while Pace’s testimony “opened the door” for Manhattan to cross-examine Pace with the pertinent UMC medical records [15] that would show the family’s decision to refuse certain treatment, because of the trial court’s ruling on the motion in limine, the defense could not do so. Additionally, the evidence, if admitted, would have possibly drawn into question Pace’s credibility, to the extent the medical records were contrary to her testimony. Based upon the unchallenged testimony, the jury was left with the impression that Allen’s condition was so severe upon arrival at UMC that she would die within twenty-four hours, regardless of any medical care she received.
¶ 34. Also, the trial court prevented Manhattan from using certain medical records during the cross-examination of Dr. Davey about Allen’s dementia and her condition. During Dr. Davey’s direct examination, he stated:
[Allen] was not dying of dementia. She wasn’t dying at all actually. She was thriving. She was doing great. So, far from declining. She was at least holding her own, maybe actually improving .... She wasn’t Sven close to dying of [dementia].
In Dr. Davey’s opinion, Allen’s dementia was not terminal, but was improving. Manhattan argues that this testimony was in direct contrast to the medical records signed by Dr. Thomas, Allen’s treating physician at the nursing home. Dr. Thomas had determined that Allen had a “terminal condition” and suffered from end-stage dementia.[16]
¶ 35. At trial, Manhattan attempted to use Dr. Thomas’s record dated August 2008 to contradict Dr. Davey’s testimony about Allen “thriving” despite her diagnosis of end-stage dementia. However, the trial court accused Manhattan’s counsel of purposely violating the in limine ruling because the document also contained the words “Do Not Resuscitate.”
¶ 36. We conclude the trial court erred in preventing Manhattan’s cross-examination of Pace about documents showing the family’s decision to withhold allegedly lifesaving treatments of vasopressors and fluids from Allen. Additionally, the trial court improperly precluded Manhattan from displaying the medical record to the jury or using it to contradict Dr. Davey’s testimony. We find the trial court abused its discretion in these matters.
*821 ¶ 37. Plaintiffs contend because all of the UMC medical records were entered into evidence, there was no prejudice from preventing defense counsel from showing the records to the jury or referencing the medical treatments. We cannot find that the jury’s possible ability to sift through nearly 150 pages of medical records, find the correct ones, and interpret them, would correct this error.
II. Hearsay Testimony
¶ 38. Manhattan argues that the trial court erred in allowing, over its objection, hearsay testimony from Plaintiffs that Allen’s condition upon arrival at UMC was hopeless. Manhattan cites to the following instances, which have been mentioned in previous issues, in support of its argument.
¶ 39. During Plaintiffs’ counsel’s opening statement, he told the jury that Allen had “24 hours or less to live.” Instead of providing the physician testimony to prove this claim, however, Pace testified that unidentified UMC ER physicians told her “mama got 24 hours to live,” so there were no decisions to make. Pace made this statement approximately four times in her direct testimony, and defense counsel properly objected each time. Likewise, Butler (Pace’s sister) testified that a UMC ER physician told her “to call your family members because your mother don’t have but 24 to 48 hours to live.” Again, defense counsel objected.
¶ 40. Mississippi Rule of Evidence 803 provides exceptions to the inadmissability of hearsay testimony. None of the exceptions provided under this rule are applicable to these statements. Rule 803(4) concerns a hearsay exception for statements made for the purpose of medical treatment or diagnosis, because those statements are more likely to be truthful. See Valmain v. State, 5 So.3d 1079,1084 (¶ 16) (Miss.2009). However, here the exception is not applicable because the rule relates only to statements made to health-care providers by individuals seeking medical treatment. The statements made by Plaintiffs were hearsay statements alleging what Allen’s physicians allegedly said about Allen’s condition. This hearsay testimony was the only evidence supporting Plaintiffs’ claim that Allen’s condition was so severe that UMC physicians thought she would not survive more than twenty-four hours, and could have been interpreted by the jury as an expert opinion to that effect. This improper testimony also contradicts the medical evidence that the Allen family had no decisions to make regarding Allen. We find the trial court abused its discretion in allowing these statements to be heard by the jury.
¶41. Plaintiffs contend the statements at issue were not to prove the truth of the matter asserted, but were simple asides, and were only relevant to show the effect these statements had on Plaintiffs, and that they did not think they had any medical decisions. We reject this contention; it is obvious from our review of the record that Plaintiffs were using the testimony to prove the truth of the matter asserted, that Allen would not survive more than twenty-four hours.
CONCLUSION
¶ 42. Because the trial court erred in excluding evidence about Allen’s family refusing vasopressors and IV fluid, as well as allowing Plaintiffs’ hearsay testimony about Allen’s condition, Manhattan was prejudiced in presenting its defense. Accordingly, we find it necessary to reverse and remand for a new trial.
¶ 43. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE *822 ASSESSED TO THE APPEL-LEES/CROSS-APPELLANTS.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WHITTEN OPINION. CARLTON, J., NOT PARTICIPATING.

. Plaintiffs included two of Allen's daughters, Bridget Pace and Lillie Butler, individually and as co-executrices for Allen's estate and on behalf of the wrongful-death beneficiaries of Allen.

. This reduction was made in accordance with Mississippi Code Annotated section 11-l-60(2)(a) (Supp.2013), after Manhattan filed a motion to reduce the verdict.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. This hospital visit was the only time in seven years at the nursing home that Allen was transferred to a hospital, until her transportation to UMC in November 2008.

.Interestingly, at trial, some of Allen's family members seemed to discount that Allen’s health had deteriorated during her residency at Manhattan, or even that she had dementia, although the medical records and testimony from physician experts for both Manhattan and UMC show otherwise.

. Another ER preliminary assessment, approximately fifteen minutes later, noted dehydration, as well as hyperglycemia, thrombocy-topenia, hypernatremia, hyperkalemia, renal insufficiency, and a suspicion of urinary tract infection (UTI).

. At trial, during proffered testimony, Plaintiffs' expert confirmed that "pressors” (short for "vasopressors”) are adrenalin-like drugs that are used to increase a person’s blood pressure when it drops, like Allen’s did. However, this information was deemed inad *814 missible by the trial judge, as will be explained later, because it dealt with the family's decision to withhold certain medical treatment.

. This information, too, was not presented to the jury due to the trial court’s ruling. Manhattan does not argue that the family was negligent in making these decisions to withhold possible "life-saving” medical treatment, but contends Manhattan was prejudiced because the jury did not hear about these decisions, which related to proximate cause of death.

. The complaint alleged Manhattan failed to provide proper nutrition, hygiene, care, attention, safety, supervision, and treatment to Allen, as well as failed to meet the appropriate standard of care, and these failures caused skin tears, pressure sores, dehydration, UTIs, pneumonia, and infections. Before trial, however, the parties entered an agreed order dismissing Plaintiffs' claims of skin tears, pressure sores, malnutrition, and infection.

. Section 11 — 1—60(2)(a) provides a limit of $500,000 for noneconomic damages awarded to the plaintiff in certain health-care actions:
In any cause of action filed on or after September 1, 2004, for injury based on malpractice or breach of standard of care against a provider of health care, including institutions for the aged or infirm, in the event the trier of fact finds the defendant liable, they shall not award the plaintiff more than Five Hundred Thousand Dollars ($500,000.00) for noneconomic damages.

. Manhattan filed a response to Plaintiffs’ supplemental brief on cross-appeal, and the Mississippi State Medical Association, the Mississippi Hospital Association, the Mississippi Nurses Association, and the Mississippi Health Care Association joined in filing an amicus curiae brief in support of Manhattan’s position, as did Governor Phil Bryant.

. We note that the trial judge focused too narrowly on the DNR designation, as Manhattan claims the DNR designation is less relevant than the withholding of vasopressors.

. Additional issues regarding Dr. Davey’s testimony will be discussed in more detail below.

. Plaintiffs introduced the theme that Allen had less than twenty-four hours to live when she arrived at UMC in their opening statement, and supported this contention with Pace’s testimony of what an unidentified physician at UMC told her. Defense counsel's objection based on inadmissible hearsay was overruled. This issue will be discussed below.

. The UMC medical records, which defense counsel was not allowed to display to the jury, state "there was some disagreement from the family about the extent of the interventions that they wanted done” during Allen's final hospitalization. On the day of Allen’s admission to UMC, her physicians were informed by the family that they did not want any invasive procedures or "pressors.” On November 17, the family again instructed UMC to withhold code drugs and "pressors.” They also asked to withhold deep suctioning and IV fluids from Allen, and instead asked that Allen be made as comfortable as possible.

.Dr. Thomas did not testify at trial; this information was from nursing-home medical records.